Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. My colleagues, Judge McEwen, Judges McEwen and Judges Van Dyke, we welcome you today. Just a few housekeeping things before we start. We actually only have one case on for oral argument this morning, but we have another a number of other cases that we've submitted. I'll call the cases in the order that they're on the next to your case. And if you're the appellant, that means your total time. So anytime you wish to reserve for rebuttal, then it's your responsibility to keep track of your time. But if you let me know aspirationally what you would like to reserve for rebuttal, I'm looking right at the clock, so I'll try to remind you when that time comes. The clock does count down, and then it goes up. And just because it's going doesn't mean I really gave you extra time. It means that you went into overtime. But if any of my colleagues are asking you questions, please feel free to continue to answer questions as long as the court is asking you questions. But otherwise, try to keep your comments to the time allotted. I realize that you consider the time yours, but we also consider it ours, because obviously you would want us to have all our questions answered before we decide your case. So the first matter is Mariano Lopez, Ramos Lopez v. Merrick Garland, 2073233. That's been submitted on the briefs and will be submitted as of this date. The next case is Ganesh Kasilagam v. Stichvich, 21-16837. That's been submitted on the briefs and will be submitted as of this date. The next case is Gurchechin Singh v. Merrick Garland, 21-70752. Submitted on the briefs will be submitted as of this date. And obviously the last case is Jason Fick v. Facebook, 21-16997. That's submitted on the briefs and will be submitted as of this date. So the case that's on for argument is John Doe v. Google YouTube, 21-16934. Each side has 15 minutes total. So we're ready. Good morning. Good morning. Thank you for having an argument on this case, Your Honors. May it please the Court. I intend to reserve four minutes for rebuttal. If you want to just state your name for the record. I was just getting there. My name is Chris Armenta. Thank you. May I proceed? Yes, please do. I represent the plaintiffs who are conservative commentators and journalists who for years published their works on YouTube. More than 15,000 videos, almost 800 million views, more than most mainstream media channels. That is until October 15, 2020, when they were summarily erased on that day. We're challenging the district court's order that dismissed the first amended complaint. The district court held that there was no state action plausibly alleged. She also did not grant leave to amend and also the decision to decline to take supplemental jurisdiction over the state contract claims. My ninth grader is studying Fahrenheit 451 in English. So I thought I would start with that, which is the case in which Ray Bradbury wrote of a Instead of putting out fires, they burned books and sometimes the people along with them in the interest of creating conformity and squelching independent thought. In this case, YouTube is the book burner. And it's the government officials and the House of Representatives itself that identified for YouTube which books to burn. The plaintiffs alleged the public officials through for years on YouTube. It was the escalating threats that public officials made out loud. Nancy Pelosi said that she would take away or she would attempt to take away Section 230 immunity. YouTube hopped to it and we allege that they did it as a result of both coercion and encouragement. One thing that's kind of weird about this is you don't have anything really in the record about what they took down. I mean, we can track it down, but then it's not really in the record, which seems kind of bizarre to me that you're making us work that hard on that. So I'm just not sure why there aren't more specific allegations relating to the specific content. Fair point. That's at issue here. Fair point, Your Honor. There are a few allegations in the first amendment complaint. And I admit, I think we admitted in our brief, they could have been much more detailed. Part of that reason is- Well, we're just kind of human beings. We wonder what we're taking down. Sure, of course. So if you look at ER 59, paragraph eight of the first amendment complaint, does talk about conspiracy theories, talks about content about Hunter Biden in the Ukraine, the ongoing corruption probe, content about social media censorship, content about QAnon. That's right in the complaint. It's also some of those are the specific issues that were identified in HR 1154. So there's a direct link between what the House of Representatives identified, what the plaintiff's content was, and then, curiously, exactly what you two put in their blog on October 15th. Well, let me ask you. Let's assume there's all that and more. The question is, does it matter? Because what I think is lacking here, maybe you can point me to it, I don't see any congressional command. And I don't see anything that links it with YouTube, for example, where it appears that your client's writings took place. Do you have any allegation you can make on that other than what you've made? I think, Your Honor, if we decide that Blum and Bantam Books and all the other cases required a congressional demand, then we're really taking the heart out of those cases where the Supreme Court said that encouragement, threats, coercion is enough. And so the question really is, were there threats and encouragement and coercion enough that, as the case law is, that the private action should be fairly attributed to the state? Well, we have a couple members of Congress, and we know they are not Congress. And I think your So you have a couple of people who have made statements. That can't be a compulsion, can it? No, it can't. And we saw that in... So what else is there then? Let me explain where the line, where I think the line should be, because I think it's very important to identify that line, if not in this case, perhaps if the case comes back. And that's this. We saw in Abiy Jamal, Senator Dole didn't like a program that was going up. That wasn't enough. We saw in a case, Elizabeth Warren criticized an Amazon book. That's not enough, because after all, the legislators do have their own First Amendment rights to say what they think. We see that a lot, and that's absolutely fair game. What is your best case? When you have Bantam Books, 1963. In Bantam Books, a New Jersey commission identified what publications it didn't like, and the publishers decided to stop circulating those books. And they did that because they were afraid of some unspecified action that could befall them. It wasn't a mandate. They weren't threatened with anything specific. In this case, by the way, YouTube was threatened with something very specific. They were threatened with the takeaway of the lifeblood of their business, which was the repeal of 230. Now, that alone isn't enough. Yeah, I mean, that seems kind of... If Congress got into a debate, which they may well, as you know, and the Supreme Court has a 230 case pending before it now, we would have a different case. But that's all in the hurly-burly of politics, whether you're for or against or you want to modify 230. There hasn't been any binding congressional action in any way or any pile-on by specific people, correct? That is correct, Your Honor. What you have to look is the combination of forces that caused external pressure on YouTube, as I think Judge Callahan wrote the opinion in the Doe versus Regents, where you have a number of forces that create pressure and reaction. So the question is, did the plaintiffs allege that there was enough pressure and the specific identification of the speech in question that YouTube reacted? Well, it's very simple to find that because all you passed its resolution on October 2nd, 2020. It identified the specific content. The plaintiff's channels had been up for years, years. YouTube never before identified conspiracy theories, QAnon, Hunter Biden's laptop, or any of those things. And suddenly, they want us to believe that on October 15th, YouTube had this sudden epiphany that they wanted to exercise their First Amendment rights that they hadn't done in years and years and years. The only thing that you can see is that H.R. 1154 that identified that specific speech was passed on October 2nd. The government's not allowed to identify by formal resolution specific speech that it wants social media to take down. I mean, this wouldn't matter if it was a private library or if it's social media. The point is, the government, in a formal way, which has been followed up, by the way, by written threats, not only audible threats, but also a writing and an admission by YouTube that it was acting on the censorship issue in partnership. In partnership. Okay, but let's assume that what everything that you say is enough for state action. Doesn't that just create a situation where you can hold the government responsible, not necessarily the private actor? Because you're, it seems to me that you're alleging that, and if we agreed with you on that, then that would bring the government in. But I don't see any case out there. It seems to me you're asking us to push it even a step further and say, therefore, then the private actor is responsible. And we are asking that, Your Honor, and that's because... But is that a step further than, am I missing something? That is a step, but it's not further than the existing law. So in the cases that we cite in our brief, Collins versus Woman Care, Brunetti versus Humane Society, and even in the courts, the courts said, this court, the Ninth Circuit, that when the private actors essentially act as agents of the state or do the state's bidding, as we contend they've done here, their conduct is transformed into that of the state, and they can be held responsible. I think you had a question, Judge. I'm sorry. Building on Judge Callahan's question, that is kind of an odd result, right? Because under your theory, Google really, really doesn't want to do this, but they just feel compelled to do it because of the government. So now we're going to, you know, add insult to injury and punish Google because the government made them, you know, under your theory. And that just seems like an odd result. It seems like you would punish the government for forcing Google to do something, not punish Google for being forced. I see what you're saying, Your Honor, but I would say that that's not necessarily the conclusion. We've played it into the alternative because until we look under the hood on this, I don't know. Were they acting in partnership, as Susan Widgett, you tweeted? Because that's what I think, I mean, that's what you actually think, and that's what a lot of people think, is that Google actually wants to take this stuff down, right? Is that Google, you know, I suppose the best case for you, Google's taking this stuff, you know, Google's thankful for the government asking them to do it so they can kind of have a little bit of a reason to do it. But if Google wants to take this down, you have a plausibility standard at the motion to dismiss stage, right, under Iqbal and Twombly. So why is it not equally plausible that, I mean, we have other cases that are challenging, you know, it's national news that these folks like platforming, you know, platforming conservatives. So, I mean, why is it not equally or more plausible that Google just wants to take these folks down and wants to do it just before, you know, you say, well, the timing's suspect here. But it's not suspect, it's right before the election. Well, it's right before the election and it's right after the passage of H.R. 1154 that specifically called out that specific kind of speech. So I don't think it's plausible, even though that's not a defense that was in the pleadings. And again, we have to go- But if that is what Google and these other platforms are doing, I think a lot of people would agree with you that's problematic. But is the fix this or is the fix some regulations that stop them from stomping on people and regulating content? Until we know the answer, we really have very little for anyone to go ahead and pass a regulation. We all know that many laws and regulations are born out of outcomes and cases. And in this case, I think that the public and we are all entitled to know exactly what happened between the passage of H.R. 1154 and how YouTube suddenly- So let me ask you this. So I hear what you're saying, but how is this lawsuit going to help them? Are you thinking that if you can get the discovery or something, you can get emails from Nancy, between Nancy Pelosi and the CEO of Google saying, let's do this or- I mean, I think we'll see what the internal machinations are. For instance, when you're talking about things that were up on the news. So last month, Zuckerberg testified that they got a directive from the FBI to take down anything related to Hunter Biden's laptop, right? And if you look at H.R. 1154, it's directing the FBI- But if Google didn't want to do this, wouldn't Google's attorney, and we'll hear from her in a second, wouldn't she come up here and say, yeah, we really didn't want to do this either, but we were forced to do it and you guys would be walking hand in hand. Well, that would be great if this was a summary judgment motion and she was under oath or this was a trial, but she's not. But you know, the other problem is even if the House resolution had some binding impact, which it doesn't, it doesn't seem to track your case because what you say, well, the FBI is directed to do something. No, all the FBI is. It encourages them to strengthen their focus on preventing violence and threats and extremism. Nothing in here even talks about YouTube in the House resolution. So I'm seeing this kind of big disconnect between your reliance on the House resolution and what actually it says. I think it's important to look at Bantam books. In that case- No, no. We can look at Bantam books, but first I'd appreciate if you'd answer my question. Where in the resolution? In the resolution, the House specifically identified, I put my glasses on for this, conspiracy theories in the very first line, in the second, ER 131. Right. Identified conspiracy theories in QAnon. In other words, it identified the specific speech that was the subject of this resolution, period. Then they used words about this kind of speech, urge, condemn, encourage, and so forth. Words that are much stronger than the Supreme Court used in Blum. Then you look at the plaintiff's complaint, and they allege that they are the word of the publishers of conspiracy theories, including conspiracy theories and QAnon. And you have then the immediately de-platforming of their content. So you have a direct link between the content that's identified in HR 1154 at ER 131 and the allegations made in plaintiff's complaint at paragraph 8. And so that's where you see the link. And the interesting thing is the district court sort of mentioned the same thing, that there weren't enough facts about the plaintiff's content, and identified that that was a lacking of the all the QAnon and the disputes over it. Let's just assume they were alleged. I don't see how it changes anything. Well, I guess that is for this court to decide. If the court's going to decide that government overreaching and interference into private conduct, where there's a clear reaction that the private company essentially, as we allege, has done the government's bidding to censor stuff that the government can do directly, but they're using YouTube to do for them. I mean, if the government says that there's going to have to be a command or a regulation, I mean, then we're creating a precedent for sure. Because that's not what Blum versus Uretsky said. That's not what Bantam said. That's not what any of the cases have said, that there has to be a command. There is no such command in the district court. Absolutely got it wrong when you look at the precedent. I'm going to give you a little time for rebuttal, but I need to talk about Bivens before I let you sit down. I understand your client's complaint to assert a First Amendment claim under Bivens. I've got two questions for you. It seems that you've got a couple of cases that are problematic for you, and one is Egbert versus Buhle, and the other is the Moleska case, which appears to foreclose the availability of Bivens in lawsuits against private corporations. So let's assume you could assert a Bivens claim. Why don't those cases cut you off at the knees? They both discussed the damages issue. They what? They're only relevant to the damages issue only. So they addressed whether damages are available, as the court is aware we were seeking injunctive relief as well, and the Bivens only applies to the judicial creation of the damages remedy, and so those cases said that you can't do that beyond the sort of precise Bivens context. So it might slice out the damages portion, but certainly we wouldn't have the damages sliced out of the supplemental contract claims and the Bivens, the issue with them. No, but you need your Federal claim that you can attach your supplemental contract claim, but if you don't have a legitimate Bivens claim, you don't have anything to attach your contract claim to, and you can, you still have your contract claim in state court, right? Of course. There are other remedies, though, like injunctive relief, which is what the plaintiffs were seeking initially, not just damages. So there are more than one single remedy for that First Amendment violation. But what is the Bivens remedy, as you understand it? As I understand it, it's a damages remedy only. It's the creation of solely a damages remedy. But, so what, if you don't want, if you're not talking about damages, then should we even be addressing your Bivens claim? We should be addressing the First Amendment claim, and so much as they asked for injunctive relief, that was part of the remedy that was requested to hold. But then we're back to the coercion and the... Exactly, to the state action issue. That's exactly where we end up. Thank you. Okay. Before I let you sit down, do either of my colleagues have any additional questions? All right. I'm going to give you two minutes for a rebuttal. All right. Thank you. Good morning. Good morning, Your Honor. May it please the Court, Lauren White, on behalf of Google and YouTube. Judge Callahan, you asked a question during my colleague's argument, which was even assuming the facts construed in the light most favorable to the appellants.     I'm not sure that that's the case. I'm not sure that that's a remedy against the government itself. Wouldn't the court have to stretch the state action theory a step farther to hold a private company liable? And I want to answer that question emphatically. Yes, it would. Appellants' allegations come nowhere close to meeting the standard necessary to extend the state action doctrine and treat a private party as the government. They allege various facts that my colleague called a combination of forces creating pressure and reaction, but their theory finds no analog or support in any of the rare cases that have treated a private party as the government. And as the Supreme Court recently explained in Halleck, quote, the state action doctrine enforces a critical boundary between the government and the individual and thereby protects a robust sphere of individual liberty. Halleck instructs courts to limit the state action doctrine to its, quote, traditional boundaries. And this court recognized as much in its decision in Prager and in at least two other cases that summarily affirmed state action theories remarkably like this one. Can I ask you a question about what, and I guess I'm not familiar with all the cases and what they, you know, what they say on this as far as when the government's acting through a private actor. But if you have a situation where the government says, you know, even a command, like let's say if you had a situation, which question whether that's in this, here in this case, but says, do this, and the private actor says, thank you, we've been wanting to do that, and so they do it. Is that, what is that, in that circumstance, do you have a, you know, the government acting, could you say it's the government acting, or do you say it's the private actor that's acting, or is it both? So, Your Honor, I've reviewed a lot of cases, as I'm sure my colleague has as well, and there are no cases finding state action against a private party under circumstances like that. The case that she, that Ms. Amenta really focused on is Bantam Books. What is your response to her argument on that? So, Bantam Books involved a state commission that issued a report identifying specific publications that it wanted booksellers to revoke from sale. That report was delivered by police officers, by government officials with authority to enforce law. There is no alleged source of government power in this case with the power or authority to enforce law, and as— So, can I ask you a question about this Bantam Books? So, that sounds pretty strong-arming, you know, those facts. Then the next question, though, is, I'm kind of getting at, after that, if you have this strong-arm, what you might call strong-arm tactics by the government, but it turns out Bantam Books, you know, issued something saying, we really want to, we really want to remove these books anyway. Is that what happened in Bantam Books? Was there anything like that where Bantam Books was saying, we want to do this anyway? We're not doing this because the government's making us do it. Not that I'm aware of, Your Honor. As I understand it, your position here is, we want to do this. We're not doing this because the government made us do it. We want to do it. We wanted to remove these people. So, it is true, Your Honor, that YouTube, in this circumstance, exercised its discretion, as even appellants admit on ER-74, they allege expressly that YouTube exercised its discretion and applied its own content policies in making the decision to remove appellants' channels. That is true. But even crediting her theory that it made those decisions based on some political pressure exerted by Nancy Pelosi and Adam Schiff and the House of Representatives, that those government actors do not bring the authority of the government itself. So, they don't have the power to coerce on behalf of the federal government. And second, if she were to concede that YouTube made this decision independently, that that would be an instance of YouTube exercising its own rights under the terms of service, where it has no obligation to host content and reserves the right to remove content. And it's rights under the First Amendment to decide. Well, let me ask you this, then. Let's just accept as true for the moment that appellants have an allegation that YouTube discriminates against conservative content. Let's accept that as true. Is there any remedy for such discrimination, particularly given YouTube's dominant market position? Absolutely, Your Honor. Appellants asserted a breach of contract claim in this case. Appellants in similar cases alleging theories similar to this one have asserted all sorts of other common law claims in tort and contract. Those remedies are available to appellants as their own, as the procedural history in this case demonstrates. But the First Amendment binds the government. It doesn't bind private parties. Only in very limited exceptions can it be extended. And this is simply not one of them. And it doesn't come close. So could there be a congressional fix to this problem if Congress, for some reason, thought that platforms such as YouTube and Google were discriminating against conservative viewpoints? I would agree that that would be a better approach, perhaps. Not one that you would like. But I mean, while we're talking about it, you're telling us basically that we're trying to fit a square peg into a round hole with the First Amendment here. But if there's a problem, what would be the fixes to that? What are the options if someone that has this kind of market power is just picking on conservative people? Well, multiple states have attempted to pass legislation to address this problem. The Supreme Court likely is going to be addressing the constitutionality and legality of those legislative attempts this term. So I think we'll have an answer very soon. But at least those states have attempted a legislative fix. And certainly, if the concern here, as appellants argue, is that there's certain political pressure, the representative branches of government are free to express opinions about public policy. This court recognized as much in American Family Association, which upheld the right of the city of San Francisco to condemn very specific political advertisements and to pressure publications and news media not to broadcast very specific advertisements. But even if Congress were to repeal 230 and the immunity or safe harbor that internet service providers and other platforms have, would that fix this First Amendment problem where they say that the company is discriminating against a certain viewpoint? They really have some nature of a First Amendment claim. How would Congress fix that? It's a difficult question, Your Honor, as I think the inability of Congress to pass any joint resolution demonstrates. I mean, even in this case, we're talking about a resolution on behalf of a single chamber of Congress. It wasn't a joint resolution. It wasn't Congress as a whole expressing some concern about the political perspectives of YouTube or any other. I mean, your position here is basically you're doing what you're doing because that's what you want to do, and no, the government isn't making you do it. Well, on a Rule 12 motion, Your Honor, we have to accept the facts as alleged as true. And here, the facts as alleged are that YouTube made this decision because it was vowing to reduce political pressure from a few individuals and the House of Representatives. There's this alternative theory that YouTube was acting jointly with the government, although that theory is not really supported by any specific factual allegations. Did the district court consider the anonymous employee declaration characterizing the content of appellant's videos as part of its 12B6 analysis, and if so, was that appropriate? She did not, Your Honor, and appellants recognize as much. On page nine of their brief, footnote one, the district court did cite the anonymous declaration in her order on the appellant's emergency TRO application. But even there, the cite was merely a C also. She did not appear to rely on the substance of the declaration in denying the temporary restraining order, but she certainly did not consider it in connection with the motion. Can you talk to me about Bivens and Egbert? Absolutely, Your Honor. There is no cause for extending the Bivens remedy here. The Supreme Court has been clear that the state action doctrine should not be expanded beyond its traditional boundaries. I would argue that the Supreme Court has been even clearer that courts should not extend the Bivens remedy beyond its traditional boundaries, and in particular, should not extend the remedy to new causes of action, such as alleged deprivations of First Amendment right, or to new categories of defendants, including private companies. We look mostly at Bivens, of course, as a damages issue and series of recent Supreme Court cases which have now constricted that. But I think the plaintiffs here say, well, even if we were to forego damages, what we really want is an injunction, or maybe an affirmative injunction to put things back up onto the web. Is that really a Bivens claim, or are you right back into the state action soup? So the case law is not exactly clear, Your Honor, on whether a party can bring a First Amendment claim untethered to a right of action like Section 1983 in the state context or Bivens in the federal context. I think appellants are very clear in their brief that they intend to proceed under Bivens, and their complaint also seeks a claim for damages on ER 74. But even putting it aside and assuming that they're not intending to proceed under Bivens and they're asserting sort of an abstract First Amendment claim and seeking solely injunctive relief, then their theory runs headlong into the problem this Court recognized in Carlin Communications. And there, the Court held that the private telephone company was a state actor in that circumstance, and that was a public utility, and it was vowing to pressure from a government agent with authority to enforce laws, the county attorney in Arizona. But putting that aside, even assuming, even finding that the telephone company was a state actor, on remand, the Court specifically held that the telephone company was free to decide what it wanted to do, but the speech that the county attorney had allegedly pressured the telephone company to remove. This Court, under the First Amendment, cannot command a private company like YouTube and dictate what it must and must not host. It has its own content policies and reserves its right to exercise discretion over how to apply and interpret those policies and how to identify specific videos and channels that fall inside or outside the line of those policies. So, do you agree, you know, there was a question to your opponent about if you punish, you know, is it appropriate to punish the private entity if it really is the government's strong argument? And do you agree, though, that I guess, I think your opponent's view is, well, the case law, that's the way it works. Of course, this is assuming that the government actually was strong-arming, and so let's just assume for a second that there was a First Amendment violation here. Is it, you know, what do the cases say about, do we punish, it seems like you'd punish the government, but do the cases say, well, we're going to punish the company? This Court's case in Sutton speaks directly to that issue, Your Honor, and that Court recognizes, doing a very detailed survey of state action cases, that the Supreme Court has never found a private party liable as a state actor under a coercion theory, and that that makes sense for exactly the reason that Your Honor recognized. What would the remedy be then? Is it an injunction against the federal government or something? There may be a claim against the government if the government is regulating in an area where it does not have the constitutional power to regulate. There may well be a First Amendment claim against the government. Here, we're not, again, talking about actual regulation or even a command with respect to specific content, and I'd like to point out my colleague repeatedly commented that the House resolution identified specific content, but it really didn't. It refers to QAnon and to conspiracy theories, but at the same time, it recognizes the harm associated with extreme ideologies from the far left and the far right. It's very general, and it purports to encourage certain federal officers to take action, and it also encourages all Americans. It's a resolution of general application. Does it address social media? I thought it was also social media to do something. It does not, Your Honor. It acknowledges that certain social media companies have already taken action, but it does not urge social media or any private companies to take any specific action with respect to speech. Judge Connelly, we've gone over. Can I ask a question? Yes, please do. I think earlier you talked about there's maybe two paradigmatic examples. There's the most paradigmatic example of state action through a private entity, which would be a government gun to the head of the private entity saying, say this, or something, right? But then you also mentioned, let's put that aside, you also mentioned the idea of working together, coordinating, and that's sort of more the concept where I guess the private entity actually agrees with the government's position, and the government doesn't have to hold a gun. Maybe they encourage them, but in that circumstance where you have a private entity that really encourages them to do something, what does the case law say about, because it seems to me like the government's involvement at that point, that one could argue at least that the government is sort of superfluous, right? The private entity, other than, I suppose, providing sort of some cover, you could call it cover, but I'm trying to figure out what is the First Amendment, what work is the First Amendment doing in that? I'm just saying the government's saying, good work, Google. We really like what you're doing. Does that somehow turn private action into government action? What do the cases say about that working together type of aspect? So, Your Honor, I think if the allegations are that the government was superfluous, then by definition the government could not be inextricably intertwined in the decision. Well, that's what I'm asking, is it superfluous when the government comes in and says, keep doing it? I mean, if I'm doing something and the government's, look over my shoulder, and the government's giving a thumbs up, I suppose it encourages me to do it more, but I'm trying to figure out, does the government still have to threaten in that context? Does it have to be a threat in that context, or can it just be, is government encouragement plus private action enough to give rise under the case law to a state action First Amendment problem in the private context? It's not, Your Honor, and we concede that Blum uses the word encourage, but this court in Roberts also recognized the need not to stretch the encouragement test too far. And in order for a party to be- So is your view, just to be clear, I want to take you over to, your view is that in that sort of circumstance, that would never be, even if the government's super encouraging and Google's super excited about doing the thing that the government's, as long as Google is super excited or wants to do the thing that the government's super encouraging them to do, that's not, that doesn't implicate the state action First Amendment doctrine? So no case has ever held a private party liable as a state actor under circumstances, anything like that. And given the Supreme Court's guidance to limit the state action doctrine to its traditional boundaries, this court would have to extend the doctrine farther than it has ever been extended to accept their theory. Well, following up on Judge Van Dyke's line of inquiry, we had ruled in Prager versus Google that the public function theory was out, and it seemed to me that the plaintiffs here have now forgone that. But my question is whether this combination of a nexus and compulsion is just another way of restating a public function theory. It's an interesting observation, Your Honor. I, that crossed my mind as well. There, certainly, my colleague has referenced the market power of YouTube as part of her general theory. The problem is she doesn't seem to take issue with the fact that YouTube has content policies and then it doesn't allow certain constitutionally protected speech on its platform. For example, pornography. According to my colleague, the problem only arises where a government official expresses some opinion about a specific type or category of constitutionally protected speech. And in that scenario, the private party loses its ability to exercise its discretion and remove speech simply because a government official agrees with or supports the decision. And that would eliminate the power of the representative branch of government to express public policy opinions in addition to removing the rights of private parties to control the content on their platforms and create the types of communities that they want to create. There's nothing further, Your Honor. Thank you. All right. Now I'll give you two minutes for rebuttal. That kind of about basically evens you up. You both got a little more questioning. Then that's the good thing about submitting cases. We're laser focused on you. Yes, Your Honor. As to Judge Van Dyke's question, when does encouragement become a constitutional issue? The cases are really clear. It's when the choice of the private party is removed. When it's such significant encouragement that the choice is said to be that of the state, not of the private party. Which is what the plaintiff's alleged here, based on the sequence and the timing of events. So if that's the case, I think you would probably agree that Google wants to remove these things too. I don't. I don't, Your Honor. I don't. Because if they had wanted to remove them, my clients are making them a lot of money. If they had wanted to remove them, they would have removed them over the 10 years prior to the passage of H.R. 1154. They wanted to make the money and affect the election would be in theory, right? And so make all the money until then just pop right then. That's the reason that we can speculate may have been. What we know are the facts, the timing. And under 12b-6 rules, there's a plausible inference that it was a reaction based on the sequence of events that occurred. That's what we're trying to get to here. There's a very distinctive sequence of events. Maybe they wanted to do it themselves. Then you know what? Let me see an internal memo that says that. Or maybe what we're going to see is a directive from the House of Representatives or the FBI identifying my client's channels and asking them to take it down between October 2nd and October 15th. I don't know the answer. But what I do feel is that we have enough for a plausible theory that it was a reaction. And the issue, Judge McKeown, is it a back way into the public function theory? I don't think so. I mean, Prager really foreclosed that until there's a solution at the Supreme Court or Congress level. I don't think we're going to see a change in that in this circuit. The issue is not whether it's a public function. The issue is the overreach of the government in identifying specific First Amendment content and placing enough pressure, as the plaintiffs have alleged, on a private party. It can happen with private libraries. It can happen in a Lyft ride. It can happen anywhere. And if we let it start to happen here, let the government overreach, let them make threats, let them make pressure, and then pass in a formal House resolution identification of the content, and the private party hops to it, and so close in time that the answer is really obvious there, we're going to start to avoid the First Amendment. And I think that's the biggest concern of my clients. Not so much of the Bivens Damage Claim, because if you look at the record, that claim, First Amendment, didn't even ask for damages. It really asked for injunctive relief and declaratory relief. The issue is, what are we doing at the First Amendment here? That's the real issue. And that's my client's interest in this case. Not necessarily in winning, but in making good law and making right law. Well, I think you've both done an excellent job of answering our questions and focusing us on the issues. Thank you, Donna. This will conclude the calendar for today, and we'll be in recess until tomorrow at 930.
judges: McKEOWN, CALLAHAN, VANDYKE